EDWARD L. KING, APPELLANT, vs. J. J. DANIEL, APPELLEE.

An *ordained* local preacher of the Methodist Episcopal Church, South, who is proved to have been in the regular discharge of his ministerial duties, at the date of the passage of the act of Congress entitled "an act to organize forces to serve during the war," approved February 17th, 1864, and continues so to be, is, by virtue of the provisions of said act, exempted from the obligation to perform military service.

This case was decided at Tallahassee.

Appeal from Suwannee Circuit Court.

A statement of the case is contained in the opinion of the court.

*Smith & Ives* for Appellant.

*L. J. Fleming* for Appellee.

DuPONT, C. J., delivered the opinion of the Court.

The questions brought up for adjudication by this appeal

involves the proper interpretation of that clause of the act of Congress, approved February 17th, 1864, entitled "an act to organize forces to serve during the war," which exempts from military service "ministers of religion."

The record shows that the appellant was arrested under the orders of the appellee, who was at the date of the arrest commandant of conscripts in the military district in which he resided. The writ of *habeas corpus* was sued out on the 18th day of October, 1864, and the return to the same was made on the 29th day of the same month, and sets forth "that the said Edward L. King is held by him, the said J. J. Daniel, Major, &c., as a conscript owing military service, by virtue of the laws thereof and the orders based thereupon, issuing from the same by enactment of the said Confederate States."

Upon the investigation which was had before the Judge of the Suwannee Circuit, the appellant exhibited his credentials, which showed him to have been ordained on the 11th day of February, 1844, as deacon, and on the 17th day of January, 1847, as elder in the Methodist Episcopal Church, South. He also exhibited in evidence his certificate of location, obtained from the annual Conference of South Carolina, and dated on the 11th day of December, 1851. The evidence further shows, that prior to the date of his certificate of location, the appellant sustained the character of an itinerant preacher in the religious denomination to which he was attached, and that since that time he has sustained the relation of a local preacher. The record further shows that he is engaged in planting, and that he has two appointments in his neighborhood, at which he preaches regularly once a month; that he administers the sacrament; performs the rites of matrimony; attends the quarterly meetings; preaches at camp-meetings and other places when called upon; but that he has not the pastoral charge of any particular congregation.

King vs. Daniel—Opinion of Court.

With this state of facts before him, the Judge, before whom the examination was had, ruled that although the evidence was full to the point that the appellant was an ordained local minister, it did not meet the other requirement of the statute, viz : that he was, at the date of the passage of the act, "in the regular discharge of his ministerial duties." It is from this ruling of the Judge below that the appeal is now brought to this court for revision.

The act under which this party was arrested exempts from military service "every minister of religion authorized to preach according to the rules of his church, and who, at the passage of the act, shall be regularly employed in the discharge of his ministerial duties." In the interpretation of this clause of the statute, and its application to the facts before us, two questions are presented for our adjudication, to-wit : First, is this party a minister of religion authorized to preach according to the rules of his church ? and secondly, was he, at the passage of the act, regularly employed in the discharge of his ministerial duties ?

By reference to the "Book of Discipline," which contains the constitution and laws of the Methodist Episcopal Church South, it will be discovered that two *orders* of "ministers" are provided for, to-wit : "Deacons and Elders." Each of these is created by the imposition of hands or ordination, and their respective functions are clearly defined and fully set forth. It appertains to the former to baptize and perform the office of matrimony in the absence of the Elder, and to *assist* the Elder in administering the Lord's Supper. To the latter, to administer baptism and the Lord's Supper, and to perform the office of matrimony and all parts of divine worship; and upon both is imposed the duty to preach and expound the word. In addition to this body of ordained ministers, provision is also made for the *licensing* suitable persons to preach, but who are not authorized to administer the sacraments of the church. These mere licentiates may

be and always are, when members of an annual Conference, appointed to the pastoral charge of circuits and stations; but whether they are embraced within the meaning of the act, it is unnecessary to decide in this case. This body of minis- ters and preachers are divided into two classes, the one " itinerant," the other " local."

Every itinerant preacher must be a member of some An- nual Conference, to which he is immediately responsible for his deportment as a man and his character as a preacher of the Gospel. He is not expected, or indeed allowed to en- gage in any secular employment or avocation which may in the slightest degree interfere with the efficient discharge of his duties as a minister of religion. He receives his field of labor by appointment of the presiding Bishop, and can ex- ercise no choice in the matter—he must go where he is sent, and may not, without incurring a forfeiture of his ministe- rial office, refuse. He takes the *Pastoral* charge of all the societies and congregations within the bounds of his appoint- ed circuit or station. He is entitled to receive as a full com- pensation for his services, a stipulated amount, denominated " quarterage," which is designed to provide clothing for him- self and family, if he has one; and in addition, he is allowed such an amount for *subsistence*, as the stewards of the cir- cuit or station may, in their discretion, see proper to desig- nate. He has no legal remedy to enforce the payment of these amounts, but must rely upon the voluntary contribu- tions of the individuals composing the societies or congrega- tions. He is expected and required to devote his whole time and talents to the work of the ministry, and when in charge of a circuit embracing several appointments, so to apportion his ministerial labors, as to dispense to each society at stated periods, the ministry of the word; thus necessitating his preaching on week days as well as on the Sabbath.

The " Local Preachers" of the Methodist Episcopal Church constitute a large and influential body of ministers, and when

King vs. Daniel—Opinion of Court.

faithful to their calling and profession, aid materially in advancing the cause of religious truth. They are not considered as *drones* in the ministry, but are expected and required to be active and zealous in the discharge of their ministerial duties. They are expected to co-operate with the Preacher in charge of the circuit, so as to dispense to all the people of the circuit the ministry of the word. Hence it is his duty and he is required to make stated appointments for preaching at localities not too remote from his residence, and to preach *regularly* at such appointed places and times ; taking care, however, that such appointments do not conflict with the regular appointments of the preacher in charge of the circuit. Receiving no compensation for his ministerial labors, but wholly dependent upon his own means for the support of himself and family, it is not required of him, that he shall devote the week-days to preaching or other ministerial duties; if he preaches regularly on the Sabbath, he is considered as complying with the established rules of his Church. Nor is a failure to occupy every Sabbath of the month deemed in all cases a dereliction of duty. It may be that from physical inability, he may be unable to undergo so much labor ; or it may so happen that from the number of Local Preachers in his vicinity who have similar appointments, or the paucity of appropriate localities for preaching, he may be unable to occupy more than two, or even one Sabbath in the month. All that is required of him by the rules of his Church is, that he shall be faithful in the discharge of his ministerial duties—labor as extensively as under the circumstances of his case may be reasonably required of him, and that his general deportment accord with the character of a christian minister. For any defect or delinquency in either of these respects, he is amenable to the Quarterly Conference of which he may be a member, and if found delinquent, they may silence him for a time, or even deprive him of his ministerial character.

The body of "Local Preachers" as a class are for the most part composed of individuals who from various causes have retired from the more active labors of the "Itineracy." When a preacher becomes physically unable to endure the privations and labors of an "Itinerant," or when his family becomes so cumbrous from the increase of numbers as to prevent their ready transfer from one circuit to another or to render them too great a charge upon the circuit or station, they are permitted to ask for a certificate of "Location," and it is within the province of the Annual Conference of which he is a member to grant it or not at their discretion. If granted, it fixes his relation to the Church, and he retains the character of a "Local Preacher," no matter how often or where he may remove to.

This being the general polity of the Methodist Episcopal Church South, to which denomination of christians this appellant belongs, the question recurs, is he a "minister of religion authorized to preach according to the rules of his Church?" The phrase "minister of religion" is of very extensive signification, but as applicable to the party to this record, the court encounters no difficulty in deciding that he comes fully within the meaning of the act. It is in evidence and fully established, that he had been *ordained* to the highest ministerial *order* known to the polity of the religious denomination of which he was a member; and there is no evidence going to show that he had ever been degraded. And such was the conclusion of the Judge before whom the investigation was had. It is unnecessary to decide whether or not *unordained* ministers come within the meaning of the act of Congress. The conclusion of the court is intended to be confined within the limits of the case now before it, and it will be time enough to decide that question when a proper case shall arise.

It was insisted by the cousel for the government, that the applicant for discharge having received a "certificate of lo-

King vs. Daniel—Opinion of Court.

cation" from the Annual Conference of South Carolina, of which he was a member at the time, the effect and operation of that action made him a " Local Preacher" only within the bounds and territorial jurisdiction of that particular Conference ; and that by his removal from without that jurisdiction, he immediately lost his ministerial character.   This is a mistaken view of the polity of the Methodist Episcopal Church, as will be seen by reference to the foregoing remarks.   The act of location in its operation and effect is not confined to territorial limits or jurisdiction, and the term " Local" is only used and designed to fix the character or relation of the party as contra distinguished from that of " Itinerant."   By the act of removal from one Conference to another, a Local Preacher loses none of his ministerial rights or functions, with this limitation, however, that before he is authorized to *exercise* his ministerial functions in the field to which he may remove, it is required of him to attach himself to some " Society," which can only be done by the presentation of a letter or certificate showing that he was in good standing at the time of his removal.   As with the private members of the Church, so is it required of the Local Preachers, that they attach themselves to some " Society."   The proof on this point is, that the party to this record regularly attended the " Quarterly Conference," and the inference is that he took part in its deliberations, which he could not have done had he not become a member thereof.   Being then a " minister of religion" within the meaning of the act, as before decided, and having complied with all the requirements of his Church, authorizing him to *exercise* his ministerial functions, we conclude that he was " authorized to preach according to the rules of his Church."

The next question presented for our consideration is, " was the applicant for discharge, at the date of the passage of the act, regularly employed in the discharge of his ministerial

13

duties ?"   The word "employed," as found in the act, is cal-
culated to raise a doubt as to the sense in which it was de-
signed to be used.   In its restricted sense, and when applied
to persons, it may very naturally be taken to pre-suppose the
existence of the relation of employer and employee and thus
involve the idea of *contract*.   Such, however, in our estima-
tion, is not the meaning that was intended to be affixed to the
word.   It was doubtless used in its more common accepta-
tion, as being synonymous with the words "engaged" or
"exercised," and therefore designated to embrace within its
scope the idea of *voluntary* ministration, as well as that
which is performed under and by virtue of *contract*.

By reference to the evidence in this case, as herein-
before collated, it will be seen that this party is a "Local
Preacher," and although engaged in planting as his secular
employment, he had *two* appointments in his neighborhood,
at which he preached *regularly* once a month.   That he ad-
ministered the sacrament, performed the rights of matrimony,
attended the quarterly meetings of his Church, and that he
preached at camp-meetings, and other places, as often as
opportunity was afforded him. It was earnestly insisted, how-
ever, by the counsel for the government, that these ministe-
rial labors had not been dispensed in the manner pointed
out in the *rules of the Church*, and therefore ought not to be
permitted to avail the party.   And to sustain this position a
paragraph in the "Book of Discipline" was cited, which is as
follows: "It shall be his" (the Preacher in charge) "duty, as
early as practicable after reaching his circuit or station, to
ascertain from the local ministers within his charge what
portion of their Sabbath time they are willing to labor in
connection with him in supplying the people with the minis-
try of the word; and after consulting their views on the
subject, it shall be his duty to sketch a general plan of min-
isterial labor for the year, and to avail himself of the aid
which they are willing to afford in enlarging the work, form-

King vs. Daniel—Opinion of Court.

ing new societies and receiving probationers into the Church."
It will be readily perceived that this rule of the Church can
have no bearing upon the point at issue. It is a rule for the
government of, and imposes a *duty* upon, the preacher in
charge of the circuit or station, and is not addressed to the
Local Preachers who may happen to reside within the bounds
of his jurisdiction; and they ought not to be held responsible for his neglect of a prescribed duty. But there was no
evidence, one way or the other, whether the ministerial labors proved to have been dispensed by this party were or
were not so dispensed in accordance with the requirements
of the rule, and in the absence of any evidence on the point,
the legal presumption is that the rule was obeyed. We are
therefore impelled to the conclusion, that the party has
brought himself fully within the additional requirement of
the act, viz: that he should have been, at the date of the passage of the act, "regularly employed in the discharge of his
ministerial duties."

Every civilized and enlightened government is bound to
regard the spiritual as well as the temporal interests of its
people, and the act before us attests the wisdom of the Confederate legislature. While the act exempts from military
service the ministers of religion, whose holy office it is to
proclaim "peace on earth and good will to men," it has carefully guarded against the abuse of this privilege, by requiring at their hands spiritual service, and it is the duty of the
judiciary, whenever a case is brought before it, to see that the
requirements of the statute be rigidly enforced.

It is ordered and adjudged that the judgment pronounced
in this case by the Judge of the Suwannee Circuit be *reversed*, and that the appellant Edward L. King be discharged
from arrest.